**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| DR. MONICA FLEMING, | § | |
| *Plaintiff* | § | |
| | § | |
| -vs- | § | SA-21-CV-01234-XR |
| | § | |
| METHODIST HEALTHCARE SYSTEM | § | |
| OF SAN ANTONIO, LTD., L.L.P. | § | |
| *Defendant* | § | |

<u>**ORDER ON MOTION FOR SUMMARY JUDGMENT**</u>

On this date, the Court considered Defendant's motion for summary judgment (ECF No. 44), Plaintiff's response (ECF No. 46), and Defendant's reply (ECF No. 52). After careful consideration, the Court issues the following order.

**BACKGROUND**

*Pro se* Plaintiff Monica Fleming brought this action for racial discrimination and retaliation under 42 U.S.C. § 1981 against Methodist Healthcare System of San Antonio, Ltd., L.L.P. ("Methodist"), where she worked from March 2016 until her resignation in August 2021.

**I.    Factual Background[1]**

Fleming worked as a physical therapist in the Acute Care Rehab Services department at Methodist for nearly four years, apparently without incident until 2020, when she began having problems with a colleague-turned-supervisor, Laci Reynolds. ECF No. 46 ¶¶ 10–12.

In February 2020, Reynolds, then Rehab Services Manager, was named interim director over the Rehab Services department after the departure of the previous director, Luis Oaxaca. ECF No. 44-1, Ex. B ("Fleming Dep.") at 59:24–64:1, 66:22–67:11, 74:1–12, 76:4–19. Fleming reported to Reynolds once Reynolds was named interim director. *Id.* at 41:20–43:2.

---

[1] The following facts are undisputed unless otherwise noted.

### A.  Spring 2020: Fleming's First HR Complaints Against Reynolds

In March 2020, Fleming applied for the permanent director position over the Rehab Services department. *Id.* at 40:12–41:6. The job was not filled at that time due to a COVID-related hiring freeze.[2] *Id.* at 40:12–23, 46:13–47:20, 77:2–78:5; ECF No. 44-1, Ex. E.

In April and May 2020, Fleming filed two complaints with Human Resources Business Partner ("HRBP") Delores DeHoyos addressing Reynolds's leadership decisions and allegedly threatening behavior towards Fleming. ECF No. 44-1, Exs. F, G. Neither document mentions racial discrimination. *See id.* Fleming reported that, on one occasion, Reynolds suggested to Fleming that her "aggressive" body language could impede her career progress at Methodist. ECF No. 44-1, Ex. G. According to Fleming, this advice constituted "dangerous rhetoric" and suggested that Reynolds held a "grudge" against her because Fleming and Reynolds had both applied for the permanent director position before the hiring freeze: "What I fear is happening is a form of retaliation and sabotage as she is aware of my qualifications and skill-set that coincide with the upcoming position." *Id.*

In May, DeHoyos met with Fleming to discuss these concerns. Fleming Dep. at 215:2–216:22. At the meeting, Fleming, who is Black, allegedly complained that Reynolds was deploying racial tropes of loud, aggressive Black women in her characterization of Fleming's behavior. *Id.* at 215:2–216:22. After the meeting, DeHoyos asked Fleming to write a summary of her concerns. ECF No. 44-1, Ex. H. Fleming prepared a four-page summary of her issues with Reynold's management, with headings such as "Priorities in patient care," "Poor Conflict resolution skills," "Difficulty with Delegation," and "Questionable Body language." *Id.* The document makes no mention of race or any other protected characteristic. *See id.*

---

[2] Fleming does not assert any claims in her lawsuit related to this position, since it was closed due to the hiring freeze. Fleming Dep. at 47:10–17.

**B. June and July 2020: Corrective Action, HR Complaint, and Appeals**

In June 2020, Fleming received a written warning based on her refusal to see an emergency COVID patient during her lunch break on June 23, 2020. ECF No. 44-1, Ex. I.

Fleming asserts that she did not learn about the order to evaluate the patient until she walked into the main Rehab office to heat up her food because, contrary to protocol, the unit secretary, Jerri Acosta, had failed to notify her of the order on her work phone. *See* ECF No. 46 at 8. According to Fleming, when Acosta told her about the order, Fleming responded that "she was currently on her lunch break . . . and probably would not be able to see that patient." *Id.* Fleming stated that she "needed to eat her lunch first" but "would come back to see how to best rectify the situation of having the patient seen." *Id.*

Fleming attempted to get her coworker Jeff Hunt and then her supervisor David Enriquez to take the patient, noting that Enriquez had "not seen a patient all day." *Id.* Enriquez was not a part of the COVID team, had never worked with COVID patients, and was unaccustomed to the donning and doffing procedures of the personal protective gear required. *See* Fleming Dep. at 253:8–256:9. Hunt, who was not the COVID therapist assigned to the unit, initially told Fleming that he did not have room in his schedule to take a COVID patient. *Id.* at 257:2–12. Ultimately, however, Hunt saw the patient.

Fleming received a final written warning the next day. The write-up, signed by Reynolds and DeHoyos, describes Fleming's actions as "disrespectful, condescending, bullying, and berating." ECF No. 44-1, Ex. I. Fleming was sent home the day she received the warning and was suspended for two days with pay. Fleming Dep. at 266:16–267:19, 274:18–275:6.

At around the same time, Fleming was allegedly relieved of her duties as a liaison for cardiovascular intensive care ("CVICU") and heart transplant rehab. *Id.* at 57:19–59:7. In this role,

which Fleming had performed since 2018, she helped schedule staff for patient programs, conducted CVICU patient rounding, and attended monthly meetings. *Id.* at 105:19–107:10.

Shortly after she was suspended, Fleming sent DeHoyos a complaint titled "Hostile Work Environment Complaint." *Id.* at 270:2–10; ECF No. 44-1, Ex. J. The complaint states that Reynolds and Enriquez had engaged in an "abuse of power" and were taking "calculated step[s]" against Fleming because "they are both aware that I have applied to take the Director of Rehab position." ECF No. 44-1, Ex. J. The complaint makes no mention of discrimination or retaliation on account of Fleming's race or any other protected characteristic. *See id.*

Fleming filed two appeals of the June 2020 corrective action. The first appeal, which did not mention racial discrimination or retaliation, resulted in a recommendation that the write-up be downgraded from a "final written" warning to a "written" warning. Fleming Dep. at 286:18–25, 290:4–12; ECF No. 44-1, Ex. K. In her second appeal, Fleming stated, "Laci Reynolds has not only demonized me but she has also weaponized the color of my skin on multiple occasions by referring to me as 'loud', 'aggressive', and 'threatening' which are known negative terms describing African-American individuals." ECF No. 44-1, Ex. L; Fleming Dep. at 291:14–292:12. In response, Methodist CEO Dan Miller removed the write-up from Fleming's file entirely. Fleming Dep. at 288:12–290:24. Because it was removed from her file before the director position reopened, the June 2020 write-up, which would otherwise have disqualified Fleming from being promoted, did not prevent Fleming from applying when the director of Rehab Services position reopened. *Id.* at 82:10–83:1, 292:13–293:12.

### C. Late 2020 to Early 2021: Unsuccessful Applications and Ethics Complaint

In September 2020 Fleming applied for a rehab manager position at Methodist Stone Oak Hospital. *Id.* at 41:7–16, 44:24–45:4; ECF No. 44-1, Ex. E. She interviewed for the position with

4

the COO of Stone Oak but learned in early October 2020 that she had not been selected for the position. Fleming Dep. at 49:22–50:1. Fleming testified that she does not know who, if anyone, was offered the position. *Id.* at 44:24–45:8. The requisition records reflect that the position was in fact cancelled. ECF No. 44-1, Ex. M.

In November 2020, Fleming again applied for the permanent director position. ECF No. 44-1, Ex. E. In late December, she interviewed with Associate Chief Operating Officer Janelle Lopez ("Lopez"). Fleming Dep. at 297:23–298:5. During the interview process, Lopez was unaware of Fleming's earlier complaints. *Id.* at 298:6–21, 300:20–302:15; ECF No. 44-1 Exs. N, EE.[3] Lopez determined that Fleming would not advance to the next round of the hiring process. Fleming Dep. at 53:11–55:3, 56:14–17; ECF No. 44-1 Ex. EE ¶ 3.

At a staff meeting in February 2021, it was announced that Reynolds would be the permanent director of the Rehab Services department. Fleming Dep. at 298:24–302:8; ECF No. 44-1, Ex. N. Upon hearing the news, Fleming left the meeting. Fleming Dep. at 298:24–300:9. Three days later, Fleming submitted an Ethics and Compliance complaint to Erica Rocha ("Rocha"), the Chief Ethics and Compliance Officer. *Id.* at 129:9–21.

### D.  May 2021: Ethics Complaint and Second Corrective Action

On May 17, 2021, the Rehab Services department sent a birthday card signed by several members of the department and a five-dollar gift card to Fleming's home address. Fleming Dep. at 304:18–306:21; ECF No. 44-1, Ex. O. Fleming testified she found this harassing "[b]ecause it's

---

[3] Fleming speculates that Lopez may have been aware of her discrimination and harassment complaints before interviewing Fleming and deciding not to advance Fleming to the next level in the hiring process. *See* ECF No. 46 at 17 ("Informing the ACOO of meeting with specific employees for employee rounding a [sic] not a common practice and leaves room for speculation regarding Lopez's knowledge of Fleming's complaints. . . This one-sided foreknowledge could have potentially cost Fleming (black female) a promotion due to false information given to Lopez by Reynolds (white female) and others."). Methodist has provided Lopez's sworn declaration stating that, at the time she made the decision not to promote Fleming to the next round in the hiring process, she was not aware of any complaints of racial discrimination or harassment. *See* ECF No. 44-1, Ex. EE ¶ 5.

not just a birthday card, even though it appears to be just a birthday card," but rather the card was "continued harassment" because it was mailed to her home address instead of hand-delivered in person at work that day. Fleming Dep. at 305:17–306:21.[4]

In response, Fleming drafted a cease-and-desist letter to Reynolds, Enriquez, and the other members of the department, stating, "This is an official notice to cease and desist from utilizing any past, present or future home address for any personal correspondence to Monica Fleming, PT, DPT, MBA. Any further use of any past, present or future address of Monica Fleming, PT, DPT, MBA, for any reason will be deemed as further harassment and her lawyer will be notified." *Id.* at 307:22–308:6; ECF No. 44-1, Ex. P. She also returned the gift card and prepared a form for a Methodist employee to sign confirming its return. Fleming Dep. at 309:21–310:12; ECF No. 44-1, Ex. Q.

Fleming followed up with Rocha about the status of her ethics complaint against Reynolds and learned that Reynolds had been given a corrective action. *See* Fleming Dep. at 303:8–16. Rocha did not provide Fleming with any details about her investigative findings or the nature of the corrective action but told Fleming that she could raise her concerns with the District Chief Ethics and Compliance Officer, Lori Allesee ("Allesee"). *Id.* at 310:19–311:8. On May 25, 2021, Fleming emailed Allesee to "escalat[e] [her] corporate complaints of racial discrimination, systemic oppression, systemic racism, a hostile work environment and harassment in the workplace from multiple senior leaders and immediate supervisory staff members." ECF No. 44-1, Ex. R. In this complaint, Fleming named Reynolds, DeHoyos, and Lopez, along with Enriquez, HR VP Alicia Dittenhoefer, and COO Kevin Scoggins. *Id.*

---

[4] It appears to be undisputed that all employee birthday cards were mailed to employees' home addresses. ECF No, 44-1, Ex. CC ¶ 6.

The next day, Fleming was called into a meeting with Reynolds, Dittenhoefer, and Lopez while working with patients in the ICU. ECF No. 46 ¶ 62. In this meeting, Reynolds gave Fleming a second written warning for "a pattern of inappropriate and unprofessional conduct in the workplace." ECF No. 44-1, Ex. S. The warning stated that Fleming had (1) "stormed out" of the February 5, 2021, meeting in which Reynolds was announced as director, (2) refused two requests for employee-monthly rounding sessions, and (3) ignored Reynolds when she asked Fleming if she had done anything fun for her birthday. *Id.*

Fleming asserts that Reynolds issued this warning in retaliation for the ethics complaint that resulted in the corrective action against Reynolds. Fleming Dep. at 324:12–325:10; ECF No. 44-1 Ex. T. Fleming does not deny leaving the meeting or declining to participate in rounding sessions, which are essentially short conversations between a supervisor and an employee. Rather, she states that she left the meeting "because no other pertinent information [was] being provided." ECF No. 46 at 17. Fleming testified that she did not feel comfortable having a one-on-one conversation with Lori Evans, the management representative who asked to round with her. Fleming Dep. at 317:3–318:1.

### E.  June 2021: HR Complaints and EEOC Charge

In early June 2021, Fleming filed a complaint with Gabriela De La Rosa in Methodist's HR department alleging "hostile work environment and racial discrimination." ECF No. 44-1, Ex. T. Fleming testified she believed she was retaliated against because she "went to ethics." Fleming Dep. at 324:12–325:10. As to Dittenhoefer, Lopez, and Evans, Fleming testified she believed their actions were racially motivated "[b]ased off their continued behavior and abuse of power," but confirmed that none of them had ever made race-based comments. *Id.* at 325:20–329:6.

Later that month, Fleming then appealed the May 2021 written warning, asserting that it was issued in retaliation for filing the ethics complaint leading to the corrective action against Reynolds. *See* ECF No. 44-1, Ex. U. The appeal mentions race only in the last sentence, in which Fleming stated that the write-up was "an abuse of power and a bullying tactic used to intimidate and retaliate against me and was racially motivated by 3 white women in leadership." *Id.* The appeal was denied. *Id.*

In the same month, Fleming allegedly learned from a co-worker that Reynolds had made dismissive comments about Juneteenth, a holiday celebrating the end of slavery in Texas. Fleming Dep. at 88:22–25, 89:3–22. During a meeting, Reynolds reportedly responded to a question about whether the Rehab Department should celebrate Juneteenth by saying, "If we have to celebrate them then we have to celebrate everyone else." *Id.* at 89:3–22.

On June 29, 2021, Fleming emailed De La Rosa, stating that both Reynolds and Enriquez had "stood over" her in a threatening or aggressive manner. ECF No. 44-1, Ex. V. The email stated that these actions made Fleming feel unsafe at work but did not reference race or any other protected characteristic. *Id.*

On the same day, Fleming filed an EEOC charge. ECF No. 44-1, Ex. W. The only person at Methodist who Fleming believed was aware of the charge was Erica Rocha in the ethics department. Fleming Dep. at 339:15–25. The EEOC dismissed the charge less than three months later without requesting a position statement from Methodist. ECF No. 44-1, Ex. X.

### F.  August 2021: Verbal Warning and Resignation

In August 2021, supervisor Damaris Alphonso gave Fleming a verbal warning for tardiness and unannounced absences. Fleming Dep. at 333:21–336:1; ECF No. 44-1, Ex. Y. Fleming did not dispute the grounds for the warning. Fleming Dep. at 333:21–336:1.

On August 24, 2021, Fleming resigned from her position with Methodist, effective immediately. ECF No. 44-1, Ex. Z. The letter states Fleming was resigning "[d]ue to the continued hostile, harassing, bullying, aggressive, toxic and retaliatory work environment under the leadership of Laci Reynolds." *Id.* The letter makes no mention of race, color, or any other protected characteristic. *See id.* By the time she resigned, Fleming had accepted another job, which she started two days after her resignation. Fleming Dep. at 38:5–18.

## II.    Procedural History

After receiving her Right-to-Sue letter from the EEOC in September 2021, Fleming filed this action on December 15, 2021, asserting claims for race discrimination under Title VII and 42 U.S.C. §§ 1981 and 1983. *See* ECF No. 1. Fleming subsequently filed an amended complaint (ECF No. 28), the operative pleading, adding factual allegations, asserting claims for disparate treatment/hostile work environment, retaliation, and disparate impact under 42 U.S.C. § 1981, and dropping her Title VII and § 1983 claims. *See* ECF No. 28. Fleming seeks declaratory and injunctive relief (including an order to implement an equality task force and various affirmative action programs), damages, and attorneys' fees. *Id.* at 16–17.

Methodist moved for summary judgment on all of Fleming's claims in July 2023, arguing that she had not suffered an adverse employment action under 42 U.S.C. § 1981 that could support a claim for racial discrimination or retaliation. ECF No. 44. Before the motion was fully briefed, however, the Court referred the case to mediation before a U.S. Magistrate Judge and administratively closed the case pending the outcome of mediation. *See* ECF No. 49. After an unsuccessful mediation in October 2023, the parties completed their briefing, and the Court reopened the case. *See* ECF Nos. 50, 52.

## DISCUSSION

### I.     Evidentiary Objections

Methodist objects to several exhibits attached to Fleming's response, including fifteen audio recordings produced in discovery and a number of text messages among employees, and to her reliance on hearsay statements by Methodist employees and an EEOC investigator. *See* ECF No. 52 at 2–5 (citing ECF No. 46 at 26–28 and ECF No. 46-1, Exs. D, E, L, W, AA, CC, FF, NN, QQ, SS, UU, VV, WW, YY, and BB).

Although a party introducing an audio recording has the burden of proving the accuracy of the recording, *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977), summary judgment evidence need not be in admissible form as long as it can be presented in admissible form at trial. FED. R. CIV. P. 56(c)(2); *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.").

Still, the purposes for which Fleming has submitted these exhibits are either immaterial or improper. For example, Fleming cites several recordings of conversations relating to her June 2020 suspension that purportedly establish that many of her colleagues gave false witness statements about her refusal to see a COVID patient. ECF No. 46 at 8–12. But even assuming that their statements were false, Fleming does not point to anything in the recordings that would suggest the statements were connected to her race.

Fleming likewise points to a text message from a co-worker describing Reynolds's "Juneteenth" remark and an audio recording of a conversation with an EEOC investigator, who allegedly "confirmed" that "Methodist did not provide any investigative reports and did not have any other evidence to dispute Fleming's claims." *See* ECF No. 46.

Regardless of whether these exhibits can be properly authenticated, they clearly contain hearsay submitted for the truth of the matter asserted without an exemption or exception under Federal Rule of Evidence 803 and are therefore inadmissible. The Court may reject summary judgment evidence as hearsay *sua sponte*. *Ward v. Jackson State Univ.*, 602 F. App'x 1000, 1003 (5th Cir. 2015) ("[O]n a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial. Accordingly, despite the lack of discussion of hearsay prior to [its] initial opinion, the district court properly considered the admissibility of the evidence.") (quoting *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012)).

As for the EEOC recording, the Court further observes that it is unsurprising that Methodist did not provide rebuttal evidence to the EEOC, which dismissed Fleming's charge of discrimination without requiring a position statement from Methodist. ECF No. 44-1, Ex. X. Regardless of the truth or falsity of the EEOC investigator's alleged statements, the record before the EEOC during its investigation has no bearing on the record now before the Court.

## II.   Summary Judgment

### A.  Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841,

847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion

for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

The Court notes that Fleming is proceeding *pro se.* While courts "liberally construe briefs of *pro se* litigants and apply less stringent standards to parties proceeding *pro se* than to parties represented by counsel, *pro se* parties must still brief the issues and reasonably comply with [federal procedural rules]." *U.S. Bank Nat'l Ass'n v. Johnson*, No. 1:15-CV-788-RP, 2017 WL 598499, at *2 (W.D. Tex. Feb. 14, 2017) (quoting *Grant v. Cuellar*, 59 F.3d 524, 524 (5th Cir. 1995). "The notice afforded by the Rules of Civil Procedure and the local rules" is "'sufficient' to advise a *pro se* party of their burden in opposing a summary judgment motion." *Id.* (citing *Martin v. Harrison Cnty. Jail*, 975 F.2d 192, 193 (5th Cir. 1992)). Likewise, "*pro se* status does not exempt [a litigant] from the usual evidentiary requirements of summary judgment." *Id.* (citing *Ellis v. Principi*, 246 F. App'x 867, 869 (5th Cir. Sept. 5, 2007) (per curiam)).

**B. Analysis**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . ." 42 U.S.C. § 1981(a). The phrase "make and enforce contracts" is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. 1981(b). When used as parallel causes of action, Title VII and § 1981 require the same proof to establish liability. *Bunch v. Bullard*, 795 F.2d 384, 387 n.1 (5th Cir. 1986); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) (Title VII and § 1981 "are functionally identical" for the purposes of claims for employment discrimination and retaliation).

### 1.   Hostile Work Environment under 42 U.S.C. § 1981

To prevail on a hostile work environment claim, a plaintiff must establish that: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment complained of was based on her membership in the protected group; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

"To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The alleged conduct must be objectively and subjectively hostile or abusive." *West v. City of Houston*, 960 F.3d 736, 741–42 (5th Cir. 2020) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). That is, the plaintiff must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable. *Hernandez*, 670 F.3d at 651 (citing *Harris*, 510 U.S. 17).

In determining whether conduct creates a hostile work environment, courts must consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interfered with the plaintiff's job performance. *Id.* To establish the fourth element, the harassment must be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). If the conduct alleged by the plaintiff is not severe or pervasive, summary judgment should be granted for the defendant. *Butler v. Ysleta Ind. Sch. Dist.*, 161 F.3d 263, 269–70 (5th Cir. 1998).

14

The Fifth Circuit has previously held that a poor performance evaluation, even when combined with other incidents, does not give rise to a hostile work environment. *Kang v. Bd. of Supervisors of La. State Univ.*, 75 F. App'x 974, 977 (5th Cir. 2003). In *Kang*, an Indian professor brought a claim for hostile work environment against Louisiana State University after he was given a bad performance review, was written-up, received a low pay raise, was not nominated for a teaching award, and was criticized at a faculty meeting in front of his peers. *Id.* at 975–76. The panel explained that these actions were not severe or pervasive enough to create an abusive working environment and affirmed the district court's summary judgment for the university. *Id.* Similarly, threats of termination and other disciplinary actions cannot establish a hostile work environment if they are not based on the employee's race. *Harris-Childs v. Medco Health Sols., Inc.*, 169 F. App'x 913, 917 (5th Cir. 2006).

Aside from a hearsay account of Reynolds' dismissive statements about Juneteenth,[5] Fleming asserts that she was subject to a hostile-work environment because Reynolds's "false accusations" against her "directly placed Fleming in a volatile and dangerous position for potential physical violence against her from Laci Reynolds, Methodist Security staff and even the San Antonio Police Department if things would have escalated[.]" ECF No. 46 at 7. The record is devoid of evidence of any threats of violence against Fleming by Reynolds or anyone else. Without more, Fleming's speculation about the theoretical possibility of violence and even her subjective fear cannot create a triable fact issue as to her hostile-work environment claim. *See Krim v. BancTexas Grp*, 989 F.2d 1435, 1449 (5th Cir. 1993) ("conclusory allegations, improbable inferences, and unsupported speculation" are not competent summary-judgment evidence).

---

[5] Even assuming that the account is admissible, such "[s]econd hand harassment, although relevant, is less objectionable than harassment directed at the plaintiff." *Johnson v. TCB Const. Co., Inc.*, 334 F. App'x 666, 670 (5th Cir. 2009) (alteration marks omitted).

Finally, Fleming cites (1) the birthday card she received from Rehab Services and (2) a litany of complaints about Reynolds's behavior as evidence of a hostile working environment. For example, she alleges that Reynolds would sometimes "purposely try to brush up against" her as she was coming down the hall; follow Fleming to the bathroom and pretend to go to the bathroom or wash her hands; ask Fleming the same questions over and over again; "shove" a phone into Fleming's face to talk about patients; make disparaging comments about an award Fleming was nominated for; and go to different units Fleming was working to observe her behavior and tell the nurse managers that she was "just trying to get an idea of [Fleming's] professionalism." *See* ECF No. 46 at 18, 21–23.

While some of the alleged behavior may have been obnoxious, and even unreasonable,[6] there is no evidence that they were racially motivated. Indeed, many of Fleming's own complaints about Reynolds to HR suggest that her conduct was motivated by some kind of personal animus or professional jealousy. *See, e.g.*, ECF No. 44-1, Ex. G ("What I fear is happening is a form of retaliation and sabotage as [Reynolds] is aware of my qualifications and skill-set that coincide with the upcoming position."), Ex. J (alleging that Reynolds had taken "calculated step[s]" because Fleming had applied for the director position). And when asked to explain her belief that the write-ups she received from Reynolds were discriminatory, Fleming testified:

> I'm not sure of her thinking pattern behind what she did and why she did what she did. To my knowledge, I can only assume, based off her behavior, her egregious behavior, that it was because of my race, as well as I was – maybe appeared to be a threat to her based off of my experience, my training, and my education.

---

[6] *See, e.g.*, Reynolds's written reprimand for, inter alia, Fleming's failure to respond when Reynolds asked if she had done anything fun for her birthday. ECF No. 44-1, Ex. S.

Fleming Dep. at 83:18–24 (emphasis added). But "Title VII does not exist to punish poor management skills; rather, it exists to eliminate certain types of bias in the workplace." *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 n.19 (5th Cir. 1995).

Fleming's subjective belief that these actions were somehow race-based cannot save her hostile work environment claim. *See Price v. Valvoline*, L.L.C., 88 F.4th 1062, 1067 (5th Cir. 2023) (declining to consider employer's "'facially neutral actions'—such as nitpicking Price's work, 'being yelled at for asking a question,' or not being forthright with him concerning his status in the attendance point system—when evaluating the totality of the circumstances for a hostile work environment," because Price presented no evidence beyond speculation that the actions were racially motivated); *McCloud v. McDonough*, No. 22-10357, 2023 WL 2525656, at *3 (5th Cir. Mar. 15, 2023) (per curiam) ("[Plaintiff] points to no facts showing that these accusations were lobbed against her because of her race, sex, age, or disability other than her adamant belief. This cannot defeat summary judgment.").[7]

Fleming has not pointed to any admissible evidence that she was subject to a racially discriminatory working environment, let alone evidence of harassment that was sufficiently severe or pervasive to defeat summary judgment. *Watts*, 170 F.3d at 509. Methodist is thus entitled to summary judgment on Fleming's hostile-work environment claim. *Butler*, 161 F.3d at 269–70.

### 2. Disparate Treatment under 42 U.S.C. § 1981

Fleming alleges that she was denied promotions and subject to discrimination in the assignment of her duties and evaluation of her performance because of her race.

---

[7] Further, "[t]o be actionable, the challenged conduct must be both *objectively offensive*, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Shepherd v. Comptroller of Pub. Accts.*, 168 F.3d 871, 874 (5th Cir. 1999) (emphasis added). The Court agrees with Methodist that "no reasonable person would objectively interpret a mailed birthday card and $5 gift card as 'a threat, abuse of power, [or] hostile and continued harassment,'" as Fleming described it, "especially not when that same practice is applied to all departmental employees." ECF No. 52 at 10 (citing ECF No. 46 at 22)).

Where, as here, a plaintiff lacks direct evidence of discrimination, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* governs. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). In order to survive summary judgment under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she is qualified for the position at issue, (3) she suffered an adverse employment action, and (4) she was replaced by someone outside the protected class or was treated less favorably than others similarly-situated. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. 792 and *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000)).

If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *Okoye*, 245 F.3d at 512. If the defendant satisfies its burden of production, the plaintiff may still prevail by offering sufficient evidence to create a genuine issue of material fact that either (1) the defendant's reason is false and is a pretext for discrimination, or (2) that although the defendant's reason is true the plaintiff's protected characteristic was a "motivating factor" in its decision. *McDonnell Douglas*, 411 U.S. at 804–05; *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 394 (5th Cir. 2008).

Thus, to survive summary judgment, the plaintiff must raise a fact issue as to whether the employer's proffered reason was either mere pretext for discrimination or only one motivating factor. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 217 (5th Cir. 2016).

### a. Defendant's Failure(s) to Promote Fleming

To establish a prima facie case of discrimination based on a failure-to-promote theory, a plaintiff must show that (1) she is a member of a protected class; (2) she sought and was qualified for a position for which applicants were being sought; (3) she was rejected for the position; and (4) the employer either (a) hired a person outside of the plaintiff's protected class, or (b) continued to seek applicants with the plaintiff's qualifications. *McMullin v. Miss. Dep't of Pub. Safety*, 782 F.3d 251, 258 (5th Cir. 2015); *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346–47 (5th Cir. 2013).

Fleming contends that, because of her race, she was not promoted to rehab manager at Methodist Stone Oak Hospital or to director of the Rehab Services department. In both instances, it is undisputed that Fleming satisfies at least two elements of a prima facie case: she (1) is a member of a protected class based on her race (Black), and (3) was rejected for the position.

As for the Stone Oak position, Methodist does not challenge Fleming's qualifications but the existence of an appropriate comparator. Fleming conceded at her deposition that she did not know who, if anyone, was offered the job. Fleming Dep. at 44:24–45:8. The requisition records, however, reflect that the Stone Oak position was in fact cancelled. *Id.*, Ex. M. Accordingly, Fleming cannot show that Methodist hired someone outside of her protected class or continued seeking applicants with her qualifications. *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 406 (5th Cir. 2021).

With respect to the Rehab Services director position, it is undisputed that Methodist ultimately hired Reynolds, who is white, thus satisfying the fourth element of Fleming's prima facie case. Methodist, however, argues that Fleming was not even qualified for the position in the first place, given her lack of managerial experience. ECF No. 44 at 12 (citing *Autry*, 704 F.3d at 347). One of the preferences for the rehab director position was three years of managerial

experience, which Fleming indicated in her application screening questions that she had, even though the job history she provided did not list any. *See* ECF No. 44-1, Ex. AA. Fleming admitted at her deposition that she had no managerial experience when she applied for the director position, or at any other time while working for Methodist. Fleming Dep. at 66:5–21.

Even assuming that Fleming was qualified for the position, Methodist has asserted a legitimate, nondiscriminatory reason for not hiring Fleming for the position: Reynolds's supervisory and management experience. ECF No. 44-1, Ex. DD, De La Rosa Decl. ¶¶ 26–27; ECF No. 44-1, Ex. EE, Lopez Decl. ¶¶ 3–4. Reynolds's application reflects that, unlike Fleming, she had four-and-a-half years' experience as a Rehab Supervisor, nine months as a Rehab manager, and had been the acting interim director for a full year when Methodist offered her the role on a permanent basis. ECF No. 44-1, Ex. BB; *see Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) ("The defendant's burden during th[e] second step is satisfied by producing evidence, which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.").

Thus, the burden returns to Fleming to prove that this reason was pretextual, or that her race was one of the reasons for Methodist's decision. *See Autry*, 704 F.3d at 347. In the failure-to-promote context, a plaintiff can create a fact issue as to pretext evidence of pretext that the unsuccessful employee was "clearly better qualified" than the successful candidate. *Id.* Fleming has failed to produce any such evidence.

Based on the summary judgment record, no reasonable jury could conclude that Methodist's reason for rejecting Fleming for the director position was a pretext for race discrimination. Accordingly, her failure-to-promote claim fails as a matter of law.

### b.  Other Alleged Adverse Employment Actions

The Fifth Circuit recently expanded the universe of actionable adverse employment actions under Title VII and Section 1981. *See Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023); *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 429 n.3 (5th Cir. 2023) (confirming that *Hamilton* applies to claims brought under 42 U.S.C. § 1981).[8] A plaintiff no longer needs to identify to an "ultimate employment decision" to establish a claim for disparate treatment but can instead show discrimination in the "terms, conditions, or privileges" of his or her employment. *Hamilton*, 79 F.4th at 502–03.

---

[8] Strangely, in a recent unpublished opinion addressing a Title VII retaliation claim, a Fifth Circuit panel described *Hamilton* as "eliminating the adverse employment action requirement from a prima facie case." *Daywalker v. UTMB at Galveston*, No. 22-40813, 2024 WL 94297, at *10 (5th Cir. Jan. 19, 2024) (per curiam). Respectfully, the Court cannot find any support for that characterization, in either *Hamilton* itself or subsequent published opinions issued by the Fifth Circuit. *See Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 429 (5th Cir. 2023) (identifying an "adverse employment action" as an element of a prima facie case under *Johnson v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449, 460 (5th Cir. 2024) (identifying an "adverse employment action" as an element of a prima facie case in a Title VII retaliation claim). The text of Title VII states that it shall be an unlawful employment practice for an employer to refuse to hire or discharge any individual because of their race. It is also unlawful to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of the employee's race. 42 U.S.C. § 2000e-2(a). Accordingly, a textual reading still requires that *some* adverse employment act occurred that affected a term, condition, or privilege of employment.

It is true that *Hamilton* eliminated the *ultimate employment decision* requirement from a prima facie case of disparate treatment under Title VII. It did not, in this Court's view, eliminate the requirement that a plaintiff establish an adverse employment action to prevail on a claim for disparate treatment or retaliation under Title VII. (Notably, *Hamilton* did not even involve a claim for retaliation.) Rather, *Hamilton* merely expanded the definition of "adverse employment action" *within* the prima facie case to reach employer conduct beyond ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.

The confusion here may lie in *Hamilton*'s procedural posture. In reviewing the district court's dismissal of Hamilton's claims under Rule 12(b)(6), the Fifth Circuit was assessing whether she had satisfied the federal pleading requirements, which the Supreme Court has held are distinct from the *McDonnell Douglas* evidentiary standard. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002). Thus, a plaintiff need not plead a prima facie case of discrimination under *McDonnell Douglas* to survive a Rule 12(b)(6) motion, "though it is sometimes helpful to frame the analysis that way." *Hamilton*, 79 F.4th at 529 n.45. At the pleading stage, a plaintiff must allege facts plausibly alleging: (1) an "adverse employment action," (2) taken against a plaintiff "*because of* her protected status." *Id.* at 529. In other words, an "adverse employment action" is not only an element of a prima facie case but something even more fundamental—a minimum pleading requirement.

To be sure, *Daywalker* is unpublished, and its characterization of *Hamilton* did not affect the outcome of the case. Given that *Hamilton* was decided so recently, however, there are relatively few cases from the Fifth Circuit applying or explaining the new standard, and lower courts and litigants alike remain anxious for further guidance. The Court merely suggests that, as parties and courts continue to navigate employment discrimination claims in the wake of *Hamilton*'s sea change, *Daywalker*'s treatment of *Hamilton* may not be a reliable guidepost.

Although the Fifth Circuit declined to provide a minimum standard for adverse actions in *Hamilton*, it later clarified in *Harrison* that an adverse employment action requires: (1) employment discrimination—the "adversity" requirement—that (2) causes the plaintiff a non-*de minimis* injury—the "materiality" requirement. *Harrison*, 82 F.4th at 430. The materiality requirement ensures that the Fifth Circuit's relaxed definition of adversity will not "transform Title VII into a general civility code for the American workplace." *Hamilton*, 79 F.4th at 504–05 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The challenged action must not only "involve[] a meaningful difference in the terms of employment" but also "injure[] the affected employee." *Harrison*, 82 F.4th at 431 (citing *Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021)).

### (i)  *Change in Duties*

To the extent Fleming argues that reassignment of her liaison duties qualifies as an adverse employment action, this argument fails because she cannot point to a non-*de minimis* injury caused by the changes in her responsibilities.

Although Fleming was allegedly relieved of her heart transplant rehab liaison duties, she acknowledged at her deposition that her "removal" did not affect her job title or compensation. *Id.* at 65:9–66:8; 111:14–18, 114:6–115:16, 198:23–199:25; *cf. Harrison*, 82 F.4th at 431 (concluding that a Black, female educator stated a claim for race and sex discrimination under Title VII based on allegations that her school district paid for white male educators, but not the plaintiff, to attend a leadership training program). While "an injury need not be an '*economically* adverse employment action[ ]'," the *de minimis* standard "prevents judges from supervising the 'minutiae of personnel management.'" *Sambrano v. United Airlines, Inc.*, No. 4:21-CV-1074-P, 2023 WL

22

8721437, at *4 (N.D. Tex. Dec. 18, 2023) (emphasis added) (quoting *Harrison*, 82 F.4th at 430–31).

Further, although Fleming complains about the reassignment of her scheduling duties, she does not explain how the loss of those duties negatively impacted the terms or conditions of her employment in any way. She does not, for example, assert that her own work schedule or patient assignments were any less favorable following the removal of her liaison duties. *Cf. Hamilton*, 79 F.4th at 503 (allegation that only male officers received full weekends off work was actionable under Title VII); *Narayanan v. Midwestern State Univ.*, No. 22-11140, 2023 WL 6621676, at *4 (5th Cir. Oct. 11, 2023) (denial of summer teaching assignments was actionable).

Further, Fleming was still able to perform rounding, a liaison role (even with some of the same patients she would have seen in that capacity), just less frequently. Fleming Dep. at 109:24–110:4, 114:6–115:16. This is unsurprising, given that, as Fleming herself acknowledges, Methodist and the Rehab Services were still adapting to their practices to manage the urgent, evolving, and then-novel COVID-19 pandemic. *See id.* at 108:9–14 (noting that the manner in which she shared her liaison role with Jeff Hunt changed over time "as the Covid team established more efficient processes"). As one district court judge once recently put it, "The COVID-19 pandemic was a once in a century event, unprecedented in the modern era. . . . [T]rial courts should not be in the business of scrutinizing these details of personnel management in such extraordinary circumstances." *See also Sambrano*, 2023 WL 8721437, at *4 ("If the *de minimis* standard excludes any workplace harm, surely it prevents judges from supervising a company's decisions regarding how employees' workspaces are sanitized, where employees take lunch, how often they submit COVID-19 test results, and the type of masks they wear.").

Neither Title VII nor Section 1981 require or even authorize this Court to scrutinize day-to-day decisions about patient rounding assignments and scheduling duties by a medical facility tasked with treating patients infected with a deadly virus in the midst of a global pandemic. "If such claims are allowed to survive at this stage, district courts would become 'super-personnel departments.'" *Id.* (quoting *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, 214 (5th Cir. 2018)). The changes in Fleming's liaison duties are a prime example of the kind of *de minimis* workplace trifles that federal employment discrimination law does not reach.

### (ii) <u>Written Corrective Actions and Performance Review</u>

During her employment with Methodist, Fleming was written up three times and suspended once with pay.

Even after *Hamilton*, the Fifth Circuit has confirmed that written reprimands, placement on a performance improvement plan ("PIP"), and other corrective or remedial measures do not constitute adverse employment actions unless they "affect job title, grade, hours, salary, or benefits or cause a diminution in prestige or change in standing among coworkers." *Lemonia v. Westlake Mgmt. Servs., Inc.*, No. 22-30630, 2023 WL 6878915, at *7 (5th Cir. Oct. 18, 2023) (cleaned up) (citing *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 823, 826 (5th Cir. 2019), *abrogated on other grounds by Hamilton*, 79 F.4th at 502–06); *see id.* at *7 ("[T]he district court did not err to the extent the court concluded that Lemonia's placement on a PIP, without more, did not constitute an adverse employment action."); *Moye v. Tregre*, No. 22-30341, 2024 WL 65424, at *3 (5th Cir. Jan. 5, 2024) ("The remedial training requirement is, at most, differential treatment that *helps* the employee." (citation and quotation marks omitted)). And rightly so—immunity from criticism cannot, logically or legally, be a "term, condition, or privilege of employment." *Cf. Smith v. McDonough*, No. SA-22-CV-01383-JKP, 2023 WL 5918322, at *5 (W.D. Tex. Sept. 8, 2023)

24

("Smith's allegations of discrimination based on criticism and scrutiny of his work and having his telecommuting agreement revoked could potentially support a finding that he was denied the terms, conditions, and privileges of employment.").

Even assuming June 2020 corrective action resulting in Fleming's paid suspension meets the de minimis threshold, to survive summary judgment, Fleming must show that she was treated less favorably than similarly situated employees who were not members of her protected class, under nearly identical circumstances. *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015). The Fifth Circuit has clarified that an appropriate comparator is an employee treated more favorably under the same circumstances or with "essentially comparable violation histories." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).

Here, Fleming points to three non-Black Methodist employees—Jeff Hunt, David Enriquez, and Katherine Johnson—each of whom allegedly refused to see COVID patients on at least one occasion but were not, to her knowledge, subject to any disciplinary action. None are appropriate comparators.[9]

When Fleming was assigned a stat COVID evaluation during her lunch break in June 2020, she asked both Hunt and Enriquez to take the patient and both initially declined. Hunt, a physical therapist, told Fleming that he did not have room in his schedule "right now." As Methodist points out, however, it is unclear from the record that Hunt knew that the patient required a stat evaluation, and, at any rate, it was Hunt who ultimately performed the evaluation. ECF No. 52 at 7–8.

---

[9] Fleming also points to text messages (which Methodist objects are unauthenticated hearsay) in which Fleming's coworkers appear to say they have "tapped out for today" or are "done seeing patients." *See* ECF No. 46 at 15; ECF No. 46-1, Ex. BB. As Methodist points out, the text messages reinforce the difference between a non-stat order (as one that can wait) and a stat order (requiring immediate attention). *See, e.g.*, ECF No. 46-1, Ex. BB (stating, "Jerry any new orders unless stat can wait till tomorrow for me."). More importantly, it is Fleming's burden to establish that the comparators she identifies are in fact similarly situated; it is not Methodist's burden to painstakingly dissect every vague gesture to conduct by other employees. *Paske*, 785 F.3d at 985; *Little*, 37 F.3d at 1075 (courts should not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts").

Enriquez, a supervisor in the Rehab Services department, was not a part of the COVID team, had not worked with COVID patients, and had not been trained on the personal protective equipment protocols for treating COVID patients. *See* ECF No. 44-1, Ex. FF, Fleming Dep. at 253:8–256:9. Notably, neither Hunt nor Enriquez were COVID therapists assigned to the unit on that date. Finally, Katherine Johnson was permitted to decline a COVID patient assignment because she had recently returned to work from having emergency gallbladder surgery and was at risk of being immunocompromised. *See* ECF No. 44-1, Ex. FF, Fleming Dep. at 275:21–27.

Thus, Fleming has no evidence that, under nearly identical circumstances, a non-Black physical therapist designated to see COVID patients refused to respond to a stat order for a COVID evaluation and was treated differently. Accordingly, Fleming cannot establish a prima facie case of employment discrimination based on her June 2020 corrective action and paid suspension, and her claim fails as a matter of law.

### *(iii) Constructive Discharge*

Fleming's resignation from her position is actionable only if it amounted to a constructive discharge. *Brown v. Kinney Show Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). A constructive discharge claim requires a plaintiff to show that her "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Newbury v. City of Windcrest*, 991 F.3d 672, 677 (5th Cir. 2021) (quotation omitted). To determine whether working conditions are sufficiently intolerable, the Fifth Circuit considers whether the plaintiff suffered: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Lauderdale v. Tex. Dep't of Crim. Just., Institutional*

*Div.*, 512 F.3d 157, 167 (5th Cir. 2007). Furthermore, "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Newbury*, 991 F.3d at 677 (quoting *Brown*, 237 F.3d at 566). Allegations of discrimination alone are insufficient to support constructive discharge. *See Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990).

Fleming cannot satisfy the stringent standard for proving constructive discharge. There is no evidence that she faced a demotion, reduction in salary, reassignment, or inquiries about whether she was quitting. More to the point, Fleming's constructive-discharge claim fails as a matter of law because, as previously discussed, Fleming has not even produced sufficient evidence of harassment to withstand summary judgment on her hostile-environment claim. *Newbury*, 991 F.3d at 677 ("In addition to a hostile-work environment, there must be aggravating factors to find that the harassment was severe enough to be constructive discharge."); *see also Vallecillo v. U.S. Dep't of Hous. & Urban Dev.*, 155 F. App'x 764, 768 (5th Cir. 2005) ("[B]ecause Appellant's hostile work environment claim has failed, his constructive discharge claim must also fail."); *see also Landgraf v. USI Film Products,* 968 F.2d 427, 430–31 (5th Cir. 1992) ("substantial harassment" involving "continuous and repeated inappropriate verbal comments and physical contact" did not rise to the level necessary to establish constructive discharge). Methodist is thus entitled to summary judgment as to any claims premised on Fleming's resignation.

### 3.  Retaliation under 42 U.S.C. § 1981

In the Fifth Circuit, retaliation claims under 42 U.S.C. § 1981 are analyzed identically to claims under Title VII. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). Accordingly, the *McDonnell Douglas* burden-shifting framework also governs Fleming's retaliation claims. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) ("As this Court has held, the *McDonnell Douglas* test applied to Title VII disparate treatment cases is also applicable to Title VII unlawful retaliation cases."). The prima facie case for retaliation

requires the plaintiff to show: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015). To establish an adverse employment action in the context of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Cabral v. Brennan*, 853 F.3d 763, 767 (5th Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Once the plaintiff meets her prima facie burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 359 (5th Cir. 2017) (citing *Raggs*, 278 F.3d at 468). And, finally, once the employer supplies such a justification, the "burden then shifts back to the plaintiff to show by a preponderance of the evidence that the employer's nondiscriminatory explanation is pretextual." *Id.*

### a. Fleming's Protected Activities

"Protected activity" is defined as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Green v. Admins. of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 26, 2002) (citing 42 U.S.C. § 2000e–3(a)). Title VII has been interpreted to "protect[] not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). An employee who files an internal complaint of discrimination engages in a

protected activity. *Flowers v. Tex. Mil. Dep't*, 391 F. Supp. 3d 655, 668 (S.D. Tex. 2018) (citing *Rodriquez v. Wal-Mart Stores, Inc.*, 540 F. App'x 322, 328 (5th Cir. 2013).

While Fleming lodged numerous complaints during her tenure with Methodist, most did not reference race, color, or any other characteristic protected under 42 U.S.C. § 1981, and thus do not qualify as protected activity. *See Rodriquez*, 540 F. App'x at 328 (concluding that, while opposition to discrimination need not be in formal written form, the plaintiff's internal complaints to management did not constitute a protected activity because "they did not reference discrimination or any other unlawful employment activity").

Viewing this history of complaints in the light most favorable to Fleming, it appears that she engaged in protected activities on five occasions in 2020 and 2021. These include her:

(1) **May 2020** comments about "racial tropes" in a meeting with DeHoyos, Fleming Dep. at 215:18–217:7;[10]

(2) **July 21, 2020** second appeal of the June 2020 corrective action accusing Reynolds of "weaponizing the color of [Fleming's] skin . . . by referring to [her] as 'loud', 'aggressive', and 'threatening'", ECF No. 44-1, Ex. L;

(3) **May 25, 2021** complaint to Methodist's ethics and compliance department alleging race discrimination and retaliation, ECF No. 44-1, Ex. R;

(4) **June 3, 2021** complaint to HR representative De La Rosa, alleging race discrimination, ECF No. 44-1, Ex. T; and

(5) **June 29, 2021** Charge of Discrimination with the EEOC, ECF No. 44-1, Ex. W.

**b. Adverse Employment Actions**

For retaliation claims, an adverse employment action is one that "a reasonable employee" would find "materially adverse, which . . . means it well might have dissuaded a reasonable worker

---

[10] Although Fleming's written complaints to DeHoyos make no reference to race-based discrimination or harassment, Fleming testified that, in a meeting with DeHoyos in May 2020 she referenced the "racial tropes." Fleming Dep. at 215:18–217:7.

from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. In determining whether an employment decision would have dissuaded a reasonable worker from engaging in protected activity, the Fifth Circuit has considered not only whether it changes "job title, grade, hours, salary, or benefits," but also whether it led to a diminution in the employee's duties or "in prestige or change in standing among . . . co-workers." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009).

As discussed above, Fleming has not produced sufficient evidence of harassment to withstand summary judgment on a hostile-environment claim or constructive discharge claim. Accordingly, she cannot base her retaliation claims on either theory of adversity.

To the extent that Fleming's retaliation claim is premised on the corrective actions she received, the Fifth Circuit has counseled that written reprimands or warnings generally are not adverse employment actions under the standard for retaliation claims.[11] *See Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 275 (5th Cir. 2013) (written warnings for performance issues did not constitute adverse employment action for retaliation claim); *DeHart v. Baker Hughes Oilfield Ops., Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (a written warning for insubordination, being argumentative, and excessive tardiness was not an adverse employment action under standard for retaliation); *see Hernandez v. Sikorsky Support Servs., Inc.*, 495 F. App'x 435, 438 (5th Cir. 2012) (concluding that, absent changes to compensation, duties, or job title, a reprimand is not an adverse employment action under the retaliation standard).

---

[11] The June 2020 write-up resulting in Fleming's suspension cannot support a retaliation claim because it was later reversed. *See Willis v. W. Power Sports, Inc.*, No. 23-10687, 2024 WL 448354, at *2 (5th Cir. Feb. 6, 2024) ("Willis fails to show that he suffered an adverse employment action. Willis's complaint alleges that he complained of the discrimination on August 20 (one day after he was first fired) and was almost immediately rehired."); *see also Brooks v. Hous. Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 590 (S.D. Tex. 2015) (decision to terminate employee that was later rescinded was not adverse employment action for retaliation claim: "Because the August 2012 decision to terminate her was rescinded with no loss of pay, it is not an adverse employment action.").

Likewise, changes in job duties over time are not typically considered adverse employment actions in the retaliation context without a corresponding change in job title, grade, hours, compensation, or benefits. *See Finch v. City of San Antonio*, No. SA-15-CV-521-XR, 2016 WL 4919967, at *7 (W.D. Tex. Sept. 13, 2016) (in retaliation context, changes in job duties, including removal of liaison responsibilities, "are not materially adverse, in that they would not discourage a reasonable employee from engaging in protected conduct").

Thus, only the denial of Fleming's promotion to director of Rehab Services after her interview with Lopez in December 2020 can serve as a possible basis for a retaliation claim.

### c.   Causal Nexus

To establish the causal link, "the evidence must show that the employer's decision . . . was based in part on knowledge of the employee's protected activity." *Sherrod v. Am. Airlines*, 132 F.3d 1112, 1122 (5th Cir. 1998). Close timing between an employee's protected activity and an adverse action against him is frequently used to establish the "causal connection" required to make out a *prima facie* case of retaliation. *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir. 1993)).

There is no bright-line rule in the Fifth Circuit for determining whether the time between the protected activity and the allegedly retaliatory conduct is too remote. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992) (declining to hold that the passage of fourteen months between the filing of the plaintiff's EEOC complaint and the date of termination was "legally conclusive proof against retaliation"); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that "a time lapse of up to four months has been found sufficient" evidence of a causal connection).

As a logical matter, none of the protected activity in which Fleming engaged *after* December 2020 could have influenced Lopez's decision that Fleming would not advance to the next stage of the hiring process. Thus, the only two activities that theoretically could have invited retaliation were Fleming's May 2020 verbal comments about "racial tropes" to DeHoyos, Fleming Dep. at 215:18–217:7, and her second appeal of the June 2020 corrective action, ECF No. 44-1, Ex. L. The temporal connection between this protected activity and Lopez's promotion decision is weak, but not dispositive.

More fundamentally, however, Fleming cannot raise a fact issue as to whether Lopez had knowledge of any protected activity. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 320 (5th Cir. 2004) ("To demonstrate the causal prong of a retaliation claim on summary judgment, a plaintiff must at least raise a question about whether the person who denied him a promotion was aware of the protected activity.") (citing *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003). Indeed, Fleming admits that Lopez knew nothing about her complaints. Fleming Dep. at 298:6–21, 300:20–302:15; *see also* ECF No. 44-1, Ex. EE, Lopez. Decl. ¶ 5. Accordingly, to the extent that Fleming asserts that Methodist failed to promote her to Rehab Services director in retaliation for her complaints of racial discrimination, her claim fails as a matter of law.

Likewise, assuming that Fleming's suspension with pay in June 2020—even following the removal of the corrective action from her file—constitutes a materially adverse action, there is no evidence of a causal nexus between the suspension and Fleming's May 2020 complaints about "racial tropes" to DeHoyos. There is no evidence that Reynolds, who submitted the write-up, was aware of Fleming's complaint of race discrimination to DeHoyos at the time. See Fleming Dep. at 227:5–229:15 (Fleming's acknowledgment that she did not know what, if anything, De Hoyos had shared with Reynolds about Fleming's complaints).; ECF No. 44-1, Ex. CC, Reynolds Decl. ¶ 5

(stating Reynolds had no knowledge of any complaints of race discrimination from Fleming when she submitted the corrective action).

Likewise, even if the change in Fleming's liaison duties is an adverse employment action under the retaliation standard, Fleming cannot connect the change to any protected activity. Fleming testified that the reassignment began in May or June of 2020. Fleming Dep. at 103:13–104:1, 105:6–107:13. The only protected activity that could have arguably led to Flemings's change in duties is her spring 2020 conversation with DeHoyos concerning "racial tropes." There is no evidence, however, that Reynolds knew about this alleged verbal report to DeHoyos. *See* ECF No. 44-1, Ex. CC, Reynolds Decl. ¶ 5.

Temporally speaking, no other protected activity could have been the cause of the reassignment because the remaining activities followed the alleged duty-changes in time. *See Finch*, 2016 WL 4919967, at *7 ("[T]here is no dispute over whether any allegedly adverse action taken against [plaintiff] in the form of removed job duties could have been causally connected to her protected activity; her protected activity had not yet occurred."). Because any removal of Fleming's job duties is not a materially adverse action that is causally linked to her protected conduct, summary judgment is appropriate.

In short, Fleming's claim for retaliation under 42 U.S.C. § 1981 fails as a matter of law.

### 4. Disparate Impact under 42 U.S.C. § 1981

Neither Methodist's motion for summary judgment nor Fleming's response addresses the disparate impact claim alleged in the operative pleading. Nonetheless, the Court considers Fleming's disparate impact claim now based on its duty to examine its subject matter jurisdiction *sua sponte* when necessary. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001).

Specifically, the Court considers Fleming's standing to assert the disparate impact claim alleged in her Amended Complaint. Article III of the United State Constitution limits a federal court's constitutional power to adjudicate a case to "genuine 'Cases' and 'Controversies.'" *California v. Texas*, 593 U.S. 659, (2021) (quoting U.S. CONST. art. III, § 2). The Supreme Court has interpreted the "case-and controversy requirement" to limit a federal court's authority to cases in which the plaintiff can establish standing. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).

To establish standing, a plaintiff must show that "(1) [she] has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Houston Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 617 (5th Cir. 2007) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

Disparate impact discrimination "addresses employment practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group." *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006), *cert. denied*, 547 U.S. 888 (2006). A disparate impact claim requires a plaintiff to identify "(1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class." *Pacheco*, 448 F.3d at 791.

To establish standing to challenge a facially neutral policy, an individual plaintiff must have actually been injured by the policy. *Manley v. Invesco*, 555 F. App'x 344, 348 (5th Cir. 2014) (affirming dismissal of a plaintiff's disparate-treatment and disparate-impact claims under Title VII and Section 1981 for lack of standing). In *Manley*, the plaintiff sought to challenge an employment agency's policy of declining to refer applicants with criminal records to hiring

companies. But the employment agency, Matrix, had in fact referred the plaintiff for a position to a recruiter with the hiring company. The recruiter then determined that the plaintiff was overqualified and decided not to forward his resume to management. The Fifth Circuit affirmed the district court's conclusion that Manley's injury—being rejected for the position—was not fairly traceable to Matrix's conduct because it had referred him for the position: "As Matrix's alleged policy of declining to refer applicants with criminal records did not cause Manley injury, his disparate impact challenge against the facially neutral policy as discriminatory against Black or male applicants [ ] fails." *Id.* at 348.

The Amended Complaint seeks to challenge a litany of allegedly discriminatory policies, practices, and procedures, including:

> (a) relying upon subjective judgments, procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias by . . . non-African-American managerial and supervisory staff and making promotions, training, performance evaluation, compensation and termination decisions; (b) refusing or failing to provide equal training opportunities to African-Americans; (c) refusing or failing to provide African-Americans with the opportunities to demonstrate their qualifications for advancement; (d) refusing or failing to establish and follow policies, procedures, practices, or criteria that reduce or eliminate disparate impact or intentional racial bias; (e) using informal, subjective selection methods which allow for rampant racial discrimination; (f) disqualifying African-American employees for vacancies by unfairly disciplining them; (g) discouraging application and expressions of interest by African Americans; (h) penalizing employees for exercising the right to forward it to them by section 1981; subjecting African-Americans to racial hostility in the work environment and some selectively terminating the employment of African-Americans.

ECF No. 28 at 13.

The closest any of these allegations comes to identifying a facially neutral policy is (f), which appears to address Methodist's policy of disqualifying employees with certain disciplinary actions in their files from promotions. *See, e.g.*, ECF No. 44 at 6 (Methodist acknowledging that

the Fleming was able to re-apply for the Rehab Services director position because the June 2020 corrective action had been removed from her file before the position reopened). Fleming lacks standing to challenge this policy, however, because it did not injure her in any way: the June 2020 corrective action did not prevent her from applying for the director position and was not even present in her file when she applied. Thus, as in Manley, Fleming's injury—being rejected for the director position—is not fairly traceable to Methodist's policy of disqualifying candidates with final written warnings from promotion opportunities. *Manley*, 555 F. App'x at 348. The remaining allegations bearing on Fleming's disparate impact claim fail to identify any facially neutral employment policy, let alone explain how Fleming was injured by the policy.

Because the Court concludes that Fleming lacks standing to bring a disparate impact claim against Methodist under Section 1981, her claim must be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 44) is **GRANTED**. Plaintiff shall take nothing by her claims and her claims are dismissed.

Defendant is awarded costs and may file a bill of costs pursuant to the local rules. A final judgment pursuant to Rule 58 will follow.

It is so **ORDERED**.

**SIGNED** this 11th day of March, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE